UNITED STATES, Appellee

v.

Jermain J. BEST, Private
U.S. Army, Appellant

No. 00-0679

Crim. App. No. 9701222

United States Court of Appeals for the Armed Forces

Argued January 25, 2005

Decided September 1, 2005

CRAWFORD, J., delivered the opinion of the Court, in which
GIERKE, C.J., and EFFRON and ERDMANN, JJ., joined.  BAKER, J.,
filed a separate opinion, concurring in the result.


Counsel

For Appellant:  Captain Eric D. Noble (argued); Colonel Mark
Cremin, Lieutenant Colonel Mark Tellitocci, and Major Allyson G.
Lambert (on brief).

For Appellee:  Captain Edward E. Wiggers (argued); Colonel
Steven T. Salata, Lieutenant Colonel Margaret B. Baines,
Lieutenant Colonel Mark L. Johnson, and Major Natalie A. Kolb
(on brief).

Military Judge: Peter E. Brownback III


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

United States v. Best, No. 00-0679/AR

Judge CRAWFORD delivered the opinion of the Court.

Contrary to his pleas, Appellant was convicted by a general court-martial of officer and enlisted members of unpremeditated murder, assault with infliction of grievous bodily harm, and carrying a concealed weapon, in violation of Articles 118, 128, and 134, Uniform Code of Military Justice (UCMJ) , 10 U.S.C. §§ 918, 928, 934 (2000).  The convening authority approved the sentence of twenty years of confinement, forfeiture of all pay and allowances, reduction to E-1, and a dishonorable discharge. The United States Army Court of Criminal Appeals affirmed the findings and sentence.  United States v. Best, No. ARMY 9701222 (A. Ct. Crim. App. Mar. 8, 2000) [hereinafter Best I].  After Appellant raised issues of mental competence and responsibility for the first time before this Court, we returned the record to the Army Judge Advocate General on November 21, 2000, for conduct of a mental examination under Rule for Courts-Martial (R.C.M.) 706.  United States v. Best, 54 M.J. 367 (C.A.A.F. 2000) (order granting additional inquiry into Appellant's mental capacity).  That examination was conducted at Fort Leavenworth, Kansas, on March 12, 2001, by a board consisting of a psychiatrist and two psychologists, who agreed that:  in 1997, Appellant was not suffering from severe mental disease or defect, nor was he "unable to appreciate the nature and quality or wrongfulness of his conduct"; and at the time of the board,

2

Appellant was suffering from "Schizophrenia, Catatonic Type Remission" and was able to "understand and cooperate in the appellate proceeding."  After reviewing those proceedings, this Court again set aside the lower court's decision on December 20, 2001, questioning the reliability of the sanity board report on the basis of an alleged conflict of interest created by membership on the board of two psychotherapists who had previously assessed Appellant's mental condition.  This Court ordered the Army Court of Criminal Appeals to determine:

> (1) Was there an actual conflict of interest [involving Drs. Galloway and Kirubakaran] sufficient to undermine the reliability of the sanity board's findings?
>
> (2) Was appellant aware of the potential conflict of interest at the time of the sanity board?
>
> (3) If so, did appellant have an opportunity to raise the issue?
>
> (4) Did appellant waive [any] conflict of interest?
>
> That, if the court concludes that there was a conflict of interest that was not waived and further concludes that the findings of the sanity board are not reliable because of a conflict of interest, the court will order another sanity board; and
>
> That, after resolving the above issues, the court will determine whether appellant has the mental capacity to understand and to conduct or cooperate intelligently in the appellate proceedings.  If so, the court will determine whether the evidence regarding appellant's mental responsibility at the time of the offenses warrants setting aside the findings and sentence.

United States v. Best, 56 M.J. 251 (C.A.A.F. 2001) (order setting aside decision of Court of Criminal Appeals in Best I and returning record for further fact-finding) (citation omitted).After reviewing the findings of the hearing convened pursuant to United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967), the court below again affirmed the findings and sentence. United States v. Best, 59 M.J. 886 (A. Ct. Crim. App. 2004)[hereinafter Best II]. On July 23, 2004, this Court granted review of the following issue:

> WHETHER THE UNITED STATES ARMY COURT OF CRIMINAL APPEALS ERRED IN HOLDING THAT THERE WAS NO ACTUAL CONFLICT OF INTEREST INVOLVING MEMBERS ON APPELLANT'S SANITY BOARD SUFFICIENT TO UNDERMINE THE RELIABILITY OF THE SANITY BOARD'S FINDINGS.

We conclude for the reasons set forth below, the court did not err.

## FACTS

We accept the factual determinations of the court below, which we include here for clarity:

> At about midnight on 5 April 1997, appellant went to the Happy Night Disco in Idar-Oberstein, Germany, with Specialist (SPC) Fowlkes and SPC Wright. At approximately 0200 hrs, 6 April 1997, SPC Brown accidentally bumped into appellant. SPC Brown apologized and turned away from appellant. Appellant grabbed SPC Brown by the arm, turned him around, and struck him in the face with a tall, heavy, beer glass. The glass broke on impact and cut completely through SPC Brown's cheek to his teeth. This injury required four stitches and left a permanent one-quarter to one-half inch scar on SPC Brown's face.

4

After appellant hit SPC Brown, several of the people near them attempted to restrain appellant. Appellant departed that area of the club and took off his easily recognizable, red and white stripe shirt and placed it under his white t-shirt. Shortly thereafter, appellant and SPC Fowlkes departed the club and waited for SPC Wright near the club entrance. A few minutes later, SPC Wright joined them and stated "a guy inside the club [] told three patrons to follow [appellant] and see where he was going, and hold him until they got out there[.]" Appellant asked to see SPC Fowlkes' "buck knife." Specialist Fowlkes gave it to him and appellant placed it in his pocket.

Appellant, SPC Fowlkes, and SPC Wright then proceeded toward SPC Wright's automobile. Private First Class (PFC) Little, SPC Bos, and SPC Woods caught up with appellant and his friends. Private First Class Little grabbed appellant by the arm, turned him around, and said, "[Y]ou need to come back with us. You just busted a dude in the face and you need to come back with us, the MPs are on their way." Appellant pulled away from PFC Little and said, "You need to back off me. Just get away," and walked across the street to SPC Wright's car. Appellant stated that he just wanted to leave. Private First Class Little again approached appellant and told him "[C]ome back; you got to be a man and live up to what you did." Private First Class Little pushed appellant back a couple of feet and appellant came back at him. They started wrestling and punching. Private First Class Little dropped to his knees and said "Oh, you got to use a knife." Appellant replied, "[Y]eah, mother[******]." Specialist Bos then came toward appellant. As SPC Bos did so, he put his hand behind his back and pretended to be holding a knife. Specialist Bos stated the following to appellant: "Oh, you gotta use a knife. I'm gonna show you a knife." Appellant turned and ran to SPC Wright's car and departed with his friends.

Lieutenant Colonel Marzouk, a forensic pathologist, testified that he conducted an autopsy on PFC Little's body. Private First Class Little was stabbed a total of twelve times -- in the heart, left lung, left arm, left armpit, and forearm. The fatal stab wound was to the left axilla, armpit, which lacerated a major vein

and artery.  Private First Class Little died as a result of blood loss.

Best I, slip op. at 3-5.

Similarly, we accept the additional factual determinations of the lower court in its April 12, 2004, decision that are pertinent to Appellant's claim of a fatal conflict of interest:

> On or about 30 September 1997, appellant arrived at the USDB [United States Disciplinary Barracks], Fort Leavenworth, Kansas.  Upon his arrival, he, like all inmates, went through a three-week reception process.  The reception process included a battery of tests to determine appellant's current psychological state.  All USDB inmates are assigned case providers.  Because appellant's test results did not indicate that his case provider needed to be a psychologist, he was assigned a mental health technician as his case provider.

> Sometime in the spring or summer of 1999, appellant began "speaking in tongues" and, infrequently, fell into trances.  Appellant expressed a belief that he "would be delivered from confinement and received into heaven on the evening of the new millennium."  Appellant's conduct was not disruptive until his belief was not confirmed and the millennium passed.

> In January 2000, appellant was on the "blotter" for two separate incidents of disobedience and he began "speaking in tongues" more frequently.  Appellant's case provider requested an assessment of appellant to determine whether appellant was suffering from some type of psychosis or a religious calling.  Doctor Ellen Galloway[3] was directed to assess appellant to determine the cause of his disruptive behavior.  Before she met appellant, Dr. Galloway: 1) discussed his status with the head chaplain and three mental health technicians; 2) reviewed his mental health records; 3) reviewed the battery of psychological tests administered to him during the reception process;[4] and 4) researched "speaking in tongues" on an Assemblies of God web page.

6

On 26 January 2000, Dr. Galloway met with appellant while he was in his cell.  The purpose of the meeting was to make initial contact with appellant, to gather preliminary data, and to advise appellant that she planned to spend extensive time the following day conducting a full assessment of him.  Appellant refused to discuss his "speaking in tongues," trances, or religious beliefs, and refused to cooperate with any psychological testing or with the clinical interview.  Appellant smiled, stated God was taking care of him, and told Dr. Galloway that he did not need any mental health intervention.  He turned his head sideways and muttered "nonsensical" syllables for approximately ten seconds.  After approximately five to ten minutes, appellant told Dr. Galloway that he was uncomfortable and unwilling to talk to her.  At that point, Dr. Galloway stopped the interview.

On 28 January 2000, Dr. Galloway prepared a memorandum for the USDB Commandant regarding appellant's mental status.  In it, Dr. Galloway stated that without more cooperation, she could not determine the driving force behind appellant's behavior.  She decided that the most likely reasons for his disruptive behavior were the result of two combined factors, "traits of a personality disorder and malingering."  Doctor Galloway further concluded, as follows:

> The personality disorder would have been sub-clinical in nature and exacerbated by his confinement.  This would have been intensified further when his expectation of deliverance was not realized.  The rigidity inherent in personality disorders would explain why he persists with his behavior despite starting to experience adverse consequences.  The malingering would explain why his behavior does not follow the pattern that [the head chaplain] stated he would have expected from an individual who speaks in tongues.  It would also explain his refusal to cooperate with any form of assessment . . . .

7

Doctor Galloway recommended, at that time, that any further disruptive or disobedient behavior should be treated as a custody and control issue rather than a mental health or religious issue. She stated that all inmates, regardless of their mental status, are expected to comply with the USDB regulations, but that a psychological issue could result in mitigating punitive action. Doctor Galloway even suggested that she be called as a witness at any board to explain the mental health circumstances.

By 3 April 2000, appellant was non-communicative with the USDB non-commissioned officers, had been on the "blotter" for more disruptive behavior, and had "been refusing to eat or drink for . . . three or four days." A physician's assistant, who was appointed to treat appellant during his hunger strike, was alarmed with appellant's behavior and refused to engage in the hunger strike protocol until appellant was psychiatrically cleared. Doctor Galloway called Dr. Kirubakaran[5] and asked him to meet with appellant on an emergency consultation.

Doctor Kirubakaran immediately met with appellant in his cell. Appellant refused to look at Dr. Kirubakaran, did not respond to any of his instructions, kept his face covered with a blanket, constantly talked to himself, and rocked his body. Because Dr. Kirubakaran was unable to fully assess appellant's mental or physical condition, he recommended appellant be sent to the nearest emergency room for a complete examination. Later, Dr. Kirubakaran diagnosed appellant with a "psychotic disorder [not otherwise specified] and concerns about catatonia." He had appellant admitted to the psychiatric services section of the Leavenworth Veterans Administration (VA) Hospital.

The VA hospital staff initially determined that appellant was depressed and was, perhaps, "playing games" with them. The VA put appellant on anti-psychotic and mood stabilizing drugs. Appellant seemed aware of his surroundings because he shook his head "no" when asked about taking his medication and allowed the nursing staff to take his vital signs and blood. Between 5 and 6 April 2000, Dr. Galloway made more than ten phone calls to the VA doctors and

8

nurses, and Dr. Kirubakaran, discussing appellant's physical and mental condition. The VA nurse working with appellant raised, with Dr. Galloway, the issue of appellant's actions as malingering. On 6 April 2000, the VA discharged appellant and he returned to the USDB. The VA's chief of psychiatric services stated that "1) Inmate Best was not catatonic[;] 2) Inmate Best was not in the middle of an acute psychotic episode[;] and 3) that he was filling an isolation room that another patient might need."

By 17 April 2000, appellant was again non-communicative, frequently shaking and covering his head with a blanket, and most of the time refusing to eat or drink. Doctor Galloway once more requested that Dr. Kirubakaran assess appellant. Doctor Kirubakaran met with appellant at appellant's cell for approximately fifteen to twenty minutes. Appellant appeared to be psychotic and agitated. Doctor Kirubakaran did not develop a treatment plan for appellant, however, because he was told that appellant was to be transferred to the United States Medical Center for Federal Prisons (Federal Medical Center) in Springfield, Missouri, because of his refusal to eat or drink.

On 26 April 2000, appellant was transferred to the Federal Medical Center. Initially, Dr. Robert Denny, a staff psychologist, assessed appellant and concluded that he probably had a serious psychotic disorder. Doctor Denny transferred him to the psychiatric hospital for closer observation to accurately diagnose appellant.

On 28 April 2000, appellant met Dr. Richard Frederick, a staff psychologist board certified in forensic psychology. Doctor Frederick was appellant's primary clinician -- responsible for conducting assessments and determining appellant's mental health status -- for approximately four months. Doctor Tom Mallory, Chief of Psychiatry, assisted in assessing and medicating appellant. Initially, they hypothesized that appellant may have been faking his illness. After weeks of observation, however, they determined that their hypothesis was illogical. "His condition was very, very serious. He was not eating. He was not responding rationally or even at all, at

9

times.  He was demonstrating very strange postural changes and mannerisms that were indicative of probably the most severe psychotic disorder."

In early May 2000, Drs. Mallory and Frederick started appellant on an involuntary, non-consensual medication regimen because they considered appellant gravely disabled and without it, at risk of death.  They began medicating appellant with very large doses of extremely powerful anti-psychotic drugs.  Even with the medication, it took appellant approximately one month to respond to staff interactions in any consistent fashion.  On 18 May 2000, Dr. Frederick diagnosed appellant as having "Schizophrenia, catatonic type, in acute exacerbation[.]"  In early June, Drs. Mallory and Frederick augmented the anti-psychotic medication with anti-depressant medication.

Doctor Frederick advised Dr. Galloway that he thought it would be in appellant's best interest to continue his treatment at the Federal Medical Center.  On 15 September 2000, a Vitek hearing[6] was conducted at Fort Leavenworth.  Doctor Frederick testified that appellant suffered from catatonic schizophrenia.  He added that many of the symptoms of the mental disorder were currently in remission because of appellant's medication regimen.  Because Dr. Galloway had not had any personal contact with appellant since April 2000, she testified that she did not have a professional opinion as to appellant's current mental condition.  After hearing all of the evidence, the military judge recommended that appellant remain at the Federal Medical Center for as long as the staff at the center determined it necessary.

Appellant continued his treatment at the Federal Medical Center from September 2000 until his transfer back to the USDB on 8 June 2001.  Once he returned to the USDB, Dr. Kirubakaran began seeing him on a monthly basis.  Appellant did "extremely well," his medication was reduced, and he did not exhibit any of the symptoms he had before.  Appellant was called to testify, by the defense, at the DuBay hearing.  He discussed his relationships with Drs. Galloway and Kirubakaran, the Vitek hearing, and the sanity board.  He answered all of the questions of the defense

10

counsel, trial counsel, and military judge in a
logical, coherent manner.

_____

[3] Doctor Galloway, Chief of the Mental Health Division
at the Directorate of Treatment Programs at the USDB,
is a Doctor of Psychology.  At the time of the DuBay
hearing, Dr. Galloway had held her position for
approximately two years as an active duty officer,
captain, and for approximately one and one-half years
as a civilian.

[4] Doctor Galloway determined these test results were
invalid because of appellant's "need to present
himself in an unrealistically socially desirable
light.  He was unwilling to admit to even minor flaws
which are considered within normal limits."

[5] Doctor Kirubakaran, the psychiatry medical officer
for Community Mental Health, which is part of the
Munson Health Center on Fort Leavenworth, is board
certified in Psychiatry, and is a consulting
psychiatrist for the USDB.  At the time of the DuBay
hearing, Dr. Kirubakaran had been a psychiatrist for
thirty-three years.

[6] Because the military does not have adequate
facilities to provide long-term, inpatient psychiatric
treatment for its prisoners, those prisoners requiring
such treatment are typically transferred to the
custody of the Federal Bureau of Prisons under the
provisions of Article 58(a), UCMJ.  Before a prisoner
can be involuntarily transferred from a prison to a
psychiatric treatment facility, he is entitled to
certain procedural safeguards, including notice,
counsel, and a hearing before an independent decision-
maker.  Vitek v. Jones, 445 U.S. 480, 63 L. Ed. 2d
552, 100 S. Ct. 1254 (1980); Army Reg. 190-47, The
Army Corrections Systems, para. 3-3 (15 Aug. 1996).

59 M.J. 888-91 (footnotes in original).

DISCUSSION

Appellant argues that R.C.M. 706 contains an implicit, per se prohibition of membership on a so-called "sanity board" by any physician or psychologist who has previously "diagnosed and/or treated" the subject of that board. In the alternative, we are urged to conclude that the results of the board convened under R.C.M. 706 to examine Appellant are fatally unreliable because of an actual or apparent conflict of interest on behalf of one or more members of that board.

At the outset, we decline the Government's invitation to view both the question of whether a conflict of interest existed and the effect of any such conflict as questions solely of fact, and thus limit our review to a determination of whether the Army Court of Criminal Appeals abused its discretion in denying relief. While there are factual questions in issue, the lower court's interpretation of R.C.M. 706 and assessment of the reliability of trial proceedings are matters of law that we review de novo, not only because the lower court's decision constitutes the recognition and formulation of legal standards, but because "the reasoning upon which it is based shows it to be a matter of law." United States v. Benson, 3 C.M.A. 351, 354, 12 C.M.R. 107, 110 (1953). Consistent with other mixed questions of fact and law, the findings of fact made by the

12

court below are accepted unless clearly erroneous. United States v. Sullivan, 42 M.J. 360, 363 (C.A.A.F. 1995).

A.  NATURE OF AN R.C.M. 706 BOARD IN THE POST-TRIAL ARENA

A sanity board is a creature not of statute, but of executive order and long-standing military practice, dating to at least 1917. See Captain Charles E. Trant, The American Military Insanity Defense:  A Moral, Philosophical, and Legal Dilemma, 99 Mil. L. Rev. 1, 66 n.349 (1983).  Referring to sanity inquiries based on the Manual for Courts-Martial, United States (MCM)(1951 ed.), para. 121, this Court has held that "[m]edical board proceedings, of course, are not judicial in nature, purpose, or effect; they are entirely administrative." United States v. Erb, 12 C.M.A. 524, 529-30, 31 C.M.R. 110, 115-6 (1961).  By comparing the participation of Drs. Galloway and Kirubakaran in Appellant's R.C.M. 706 board to a trial judge who reviews his own rulings, Appellant fails to recognize the distinction between administrative and judicial bodies.  As an administrative board, whose members are typically appointed by a medical commander and not by the convening authority, and whose findings do not bind the court-martial in its determination of either competence (R.C.M. 909(e)) or mental responsibility (R.C.M. 916(k)(3)(C) and 921(c)(4)), a board convened under R.C.M. 706 cannot be analogized to a court of members.  For example, doctors serving on an R.C.M. 706 board would not only

13

be granted access to an appellant's prior medical records, including previous diagnoses by other doctors, but would be encouraged to read those prior records to develop a full picture of an appellant's mental history. Thus, in this case, Drs. Galloway and Kirubakaran would have access to previous diagnoses of Appellant regardless of whether they made those diagnoses.

Nonetheless, we have frequently recognized the important protections afforded by R.C.M. 706 and its predecessors to servicemembers facing the court-martial process. We have emphasized the responsibility of the convening authority and the military judge to order a sanity board when required, as well as the duty of all participants in the process to bring to the attention of the convening authority or military judge any condition or behavior that may reasonably call into question the mental responsibility or competence of an accused. United States v. Collins, 60 M.J. 261 (C.A.A.F. 2004).

Although post-trial R.C.M. 706 boards are not expressly sanctioned by the rule (or by its predecessors, MCM (1951 ed.), para. 121, and MCM (1969 ed.), para. 121), this Court has historically addressed issues associated with such boards:

> In the Uniform Code of Military Justice, sanity is mentioned directly only with respect to trial proceedings, and not at all in connection with post-trial review. See Articles 51 and 52, 50 USC §§ 626 and 627. Paragraph 121 of the 1951 Manual is entitled "Inquiry before Trial" -- and therefore, on its face, would appear to be inapplicable to mental disease

14

first appearing during the appellate process, and not present either at the time of the crime or that of the trial. However, this same Manual division is referenced in paragraph 124, which is concerned with the post-trial action of the convening, or of higher, authority. This mention we construe to be directed to insuring that, in a proper case, the convening authority will direct the convention of a medical board of inquiry -- as provided in paragraph 121 -- for the purpose of answering three questions concerning the accused's mental condition. The first two of these have to do with mental <u>responsibility</u> for the crime; the third concerns mental <u>capacity</u> and is phrased as follows: "Does the accused possess sufficient mental capacity to understand the nature of the proceedings against him and intelligently to conduct or cooperate in his defense (120<u>c</u>)?"

United States v. Washington, 6 C.M.A. 114, 118, 19 C.M.R. 240, 244 (1955).

Further, "when not restrained by the 2-year limitation of Article 73, [UCMJ, 10 U.S.C. § 873] we have given preferential treatment to the question of mental responsibility when raised for the first time on appeal." United States v. Murphy, 50 M.J. 4, 15 (C.A.A.F. 1998) . In so doing, however, this Court has made plain that to constitute reversible error, the existence or outcome of a sanity board must have had a substantive effect on the trial:

It is true that, historically, sanity has occupied a special status in military law. However, to prevail on appeal an accused must convince an appellate court that a "different verdict might reasonably result" if the trier of fact had evidence of a lack of mental responsibility that was not available for consideration at trial.

United States v. Breese, 47 M.J. 5, 6 (C.A.A.F. 1997).

15

United States v. Best, No. 00-0679/AR

See also United States v. Young, 43 M.J. 196, 197 (C.A.A.F.

1995); United States v. Dock, 28 M.J. 117, 119, 120 (C.M.A.

1989).

B. QUALIFICATION AND DISQUALIFICATION OF SANITY BOARD MEMBERS

    1.   Federal Civilian References

    Although applicable only by analogy, we note that 18 U.S.C.

§ 4247(b)(2000), provides, in part:

> A psychiatric or psychological examination ordered
> pursuant to this chapter shall be conducted by a
> licensed or certified psychiatrist or psychologist,
> or, if the court finds it appropriate, by more than
> one such examiner.  Each examiner shall be designated
> by the court, except that if the examination is
> ordered under section 4245 [commitment of those
> already imprisoned] or 4246 [commitment of prisoners
> due for release], upon the request of the defendant an
> additional examiner may be selected by the defendant .
> . .  Unless impracticable, the psychiatric or
> psychological examination shall be conducted in the
> suitable facility closest to the court.

    Neither this section nor Federal Rule of Criminal Procedure

12.2, on the same subject, precludes examination of a defendant

by a psychotherapist who has previously assessed, examined,

diagnosed, or treated that defendant.  In fact, by allowing the

defendant to pick his own additional examiner in certain

situations, the statute appears to invite participation in the

process by a treating psychotherapist, though not in the

specific context of a pretrial sanity inquiry.

    Few cases in the federal circuits have examined conflicts

of interest involving psychotherapists, and none has considered

the precise question of whether a psychotherapist who has entered even a limited practitioner-patient relationship should be excluded from participation in future, unbiased evaluations of that patient.  Even so, we are aided by the logic of the Third and Seventh Circuits on related topics.

Addressing whether a treating physician should be allowed to testify as an expert witness for the patient he had treated, the Third Circuit said:

> Opinions by physicians who have neither examined nor treated a patient "have less probative force, as a general matter, then they would have if they had treated or examined him." Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984).  In the context of social security disability cases, in fact, we afford greater weight to a treating physician's opinion.  See Dorf v. Bowen, 794 F.2d 896 (3d Cir. 1986); Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986).  "The rationale for giving greater weight to a treating physician's opinion is that he is employed to cure and has a greater opportunity to know and observe his patient. . . ." Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987).

Holbrook v. Lykes Bros. S.S. Co., Inc., 80 F.3d 777, 782-783 (3d Cir. 1996).

In Silagy v. Peters, when invited to find a due process violation in the alleged incompetence of one or more of the psychiatrists appointed to examine that appellant, the Seventh Circuit observed:

> [W]e would be reluctant to open up this type of [Ake v. Oklahoma, 470 U.S. 68 (1985)] claim to a battle of the experts in a "competence" review.  Every aspect of a criminal case which involves the testimony of

17

experts could conceivably be subject to such a review -- a never[-]ending process. In this case, as the district court noted, three experienced, board-certified, independent practicing psychiatrists were appointed to examine the Petitioner. Each psychiatrist conducted a thorough examination and submitted his diagnosis to the court . . . Without regard to their ultimate diagnoses, we believe that this meets the requirements set forth in Ake. A conclusion to the contrary would require this court and other federal courts to engage in a form of "psychiatric medical malpractice" review as part-and-parcel of its collateral review of state court judgments. The ultimate result would be a never-ending battle of psychiatrists appointed as experts for the sole purpose of discrediting a prior psychiatrist's diagnosis. We do not believe this was the intent of the Court in Ake when it held that indigent defendants who raise a defense of insanity are entitled to psychiatric assistance in the preparation of their defense. Accordingly, we reject Petitioner's fourteenth amendment due process claim concerning the competence of the psychiatrists at his trial.

905 F.2d 986, 1012-13 (7th Cir. 1990).

While the Seventh Circuit specifically noted that each of these psychiatrists was "independent" -- the quality Appellant claims is missing in his case -- we believe that reference was to the right to an expert independent of the prosecution established by Ake: "In the cases, 'independent' as opposed to 'neutral' means that the expert must be additional to, and separate from, court-appointed experts or experts engaged by the prosecution." Orbe v. True, 233 F. Supp. 2d 749, 776 (E.D. Va. 2002) (discussing a mental health expert in a capital case).

18

2.  Military References

The UCMJ specifies numerous qualifications for participants in the military justice process.  Congress has established statutory qualifications for convening authorities (Articles 22, 23, 24, UCMJ, 10 U.S.C. §§ 822, 823, 824 (2000)), court members (Article 25, UCMJ, 10 U.S.C. § 825 (2000)), military judges (Article 26, UCMJ, 10 U.S.C. § 826 (2000)), trial and defense counsel (Article 27, UCMJ, 10 U.S.C. § 827 (2000)), and investigating officers (Article 32, UCMJ, 10 U.S.C. § 832 (2000)).  Congress provided for court reporters and interpreters (Article 28, UCMJ, 10 U.S.C. § 828 (2000)) but left their qualifications to the service secretaries.

Likewise, pursuant to his authority under Article 36, UCMJ, 10 U.S.C. § 836 (2000), the President has promulgated the Manual for Courts-Martial establishing or embellishing qualifications for convening authorities, court members, military judges, counsel, court reporters, bailiffs, interpreters, escorts, clerks, and guards. See generally R.C.M., ch. V.

R.C.M. 706 establishes requirements for sanity boards, including membership qualifications:

> By whom conducted.  When a mental examination is ordered under subsection (b) of this rule, the matter shall be referred to a board consisting of one or more persons.  Each member of the board shall be either a physician or a clinical psychologist.  Normally, at least one member of the board shall be either a psychiatrist or a clinical psychologist.  The board

19

> shall report as to the mental capacity or mental
> responsibility or both of the accused.

R.C.M. 706(c)(1).

R.C.M. 706 does not address professional conflicts of interest for sanity board members.  Both the discussion and the drafter's analysis are silent on the issue.  Neither the 1951 Manual for Courts-Martial, nor the May 1953 edition of the Department of the Army's Technical Manual (TM) 8-240, Psychiatry in Military Law, addressed conflicts of interest for sanity board members or prohibited appointment to such boards of mental health practitioners who may have previously diagnosed or treated an accused.[1] However, in 1961, this Court noted, without comment, the appointment of a treating psychiatrist to a "competency board" (predecessor of the R.C.M. 706 board) pursuant to a local requirement that the doctor "personally responsible" for the accused be a member of the board.  Erb, 12 C.M.A. at 529, 31 C.M.R. at 115.  In fact, in Erb, the accused's psychiatrist was appointed as a member of the second competency board, notwithstanding his participation in the first board as the psychiatrist who "presented the case to the board."  Erb, 12 C.M.A. at 529, 31 C.M.R. 115.  This second board found that Sergeant Erb was a chronic

---

[1] Subsequent editions of these references are similarly silent.

schizophrenic, but could distinguish right from wrong and had an impaired ability to form the specific intent for "homicide." Id. This Court's silence on the issue of board membership is noteworthy because, on appeal, one claim raised by Sergeant Erb was that improper command influence had affected the result of the second board appointed to inquire into his sanity. The defense contended that the board results had been manipulated "without regard to their reliability or trustworthiness" to ensure the trial and conviction of Sergeant Erb. Erb, 12 C.M.A. at 530, 31 C.M.R. 116 (emphasis added). This Court's opinion did not question participation on the board by Sergeant Erb's treating psychiatrist. Finally, Erb cautions against looking for a "correct" diagnosis: "Psychiatry is not an exact science; and individual psychiatrists may differ strongly in their findings regarding an accused." Erb, 12 C.M.A. at 529, 31 C.M.R. at 115 (citing United States v. Carey, 11 C.M.A. 443, 29 C.M.R. 259 (1960); United States v Kunak, 5 C.M.A. 346, 369; 17 C.M.R. 346 369 (1954) (Quinn, C.J., dissenting)).

Responding to one appellant's broad challenge to the neutrality of military psychotherapists appointed to sanity boards, this Court said:

> [i]n the many records that have passed through this
> Court, we have observed no tendency on the part of
> military psychiatrists to favor either the prosecution
> or the defense.  We are satisfied that their
> determinations are impartial and that they seek not to
> uncover evidence for the Government but truly to
> determine the mental condition of the accused. . . .
> Military psychiatrists are paid by the Government, but
> so are defense counsel.  We are certain that neither
> group shirks its professional responsibilities because
> they are employees of the United States.

United States v. Johnson, 22 C.M.A. 424, 427, 47 C.M.R.

402, 405 (1973).

In United States v. Loving, this Court declined to expand

the membership requirements of R.C.M. 706:

> The next question is whether the requirements of
> RCM 706 (Change 3) have been met.  RCM 706(c)(1)
> provides that an inquiry into mental capacity or
> mental responsibility "shall be referred to a board
> consisting of one or more persons.  Each member of the
> board shall be either a physician or a clinical
> psychologist."
>
> We hold that the requirements of RCM 706(c)(1)
> have been met in appellant's case.  A board consisting
> of a single psychiatrist would have satisfied the
> rule.  Furthermore, even assuming arguendo that CPT
> Coleman had not received his Ph.D. degree at the time
> he participated in the board, there is nothing in the
> rule requiring that a "clinical psychologist" possess
> a Ph.D.  The record before us reflects that CPT
> Coleman was a trained psychologist, was credentialed
> by Army medical authorities as a clinical
> psychologist, and was assigned to duties as a clinical
> psychologist.  RCM 706 was amended in 1986 to parallel
> prevailing federal practice of allowing use of
> clinical psychologists in mental status evaluations.
> Drafters' Analysis of RCM 706(c)(1), Manual, supra at
> A21-36 (Change 3).  Unlike 18 USC § 4247(b), RCM
> 706(c)(1) does not specify that the psychiatrist or
> psychologist performing the evaluation be "licensed or
> certified."  Nevertheless, in the absence of evidence

22

to the contrary, the fact that CPT Coleman was
credentialed by military medical authorities to
perform duties as a clinical psychologist raises a
presumption that he was qualified to do so.  See
United States v. Masusock, 1 U.S.C.M.A. 32, 35, 1
C.M.R. 32, 35 (1951) ("presumption of regularity in
the conduct of governmental affairs").  That
presumption has not been rebutted in this case.

41 M.J. 213, 241 (C.A.A.F. 1994).

### 3.  Medical and Analogous References

Although there are no readily applicable ethical guidelines

for psychiatrists,[2] the American Psychological Association's

(APA) Ethical Principles of Psychologists and Code of Conduct,

which became effective in 1992, contains at least two applicable

standards:

1.17 Multiple Relationships.

(a) . . . Psychologists must always be sensitive to
the potential harmful effects of other contacts on
their work and on those persons with whom they deal.
A psychologist refrains from entering into or
promising another personal, scientific, professional,
financial, or other relationship with such persons if
it appears likely that such a relationship reasonably
might impair the psychologist's objectivity or
otherwise interfere with the psychologist's
effectively performing his or her functions as a
psychologist, or might harm or exploit the other
party.

(b) Likewise, whenever feasible, a psychologist
refrains from taking on professional or scientific

---

[2] See 3 Jay Ziskin & David Faust, Coping with Psychiatric and
Psychological Testimony 17 (5th ed. 1995).  See also American
Academy of Psychiatry & the Law Ethical Guidelines for the
Practice of Forensic Psychiatry (adopted 1987, revised 1995).

23

obligations when pre-existing relationships would create a risk of such harm.

(c) If a psychologist finds that, due to unforeseen factors, a potentially harmful multiple relationship has arisen, the psychologist attempts to resolve it with due regard for the best interests of the affected person and maximal compliance with the Ethics Code.

. . . .

7.02 Forensic Assessments.

(b) . . . psychologists provide written or oral forensic reports or testimony of the psychological characteristics of an individual only after they have conducted an examination of the individual adequate to support their statements or conclusions.

Both Drs. Galloway and Kirubakaran testified that they were aware of these guidelines, had considered them, and had concluded that no conflict of interest existed. No case law, commentary, or analysis is available to enlighten our consideration of their conclusions.

While not in force at the time of Appellant's sanity board, the 2003 revision of the APA ethical standard for multiple relationships is enlightening:

3.05 Multiple relationships.

(a) A multiple relationship occurs when a psychologist is in a professional role with a person and (1) at the same time is in another role with the same person . . . . A psychologist refrains from entering into a multiple relationship if the multiple relationship could reasonably be expected to impair the psychologist's objectivity, competence, or effective-ness in performing his or her function as a psychologist, or otherwise risks exploitation or harm

24

to the person with whom the professional relationship exists.

Multiple relationships that would not reasonably be expected to cause impairment or risk exploitation or harm are not unethical.

. . . .

3.06 Conflict of Interest.

Psychologists refrain from taking on a professional role when personal, scientific, professional, legal, financial, or other interests or relationships could reasonably be expected to 1) impair their objectivity, competence, or effectiveness in performing their function as psychologists or 2) expose the person or organization with whom the professional relationship exists to harm or exploitation.

APA Ethical Principles of Psychologists and Code of Conduct §§ 3.05, 3.06 (2003).

Neither the Office of Government Ethics' Standards of Ethical Conduct for Employees of the Executive Branch, 5 C.F.R. pt. 2635 (2005), nor the Department of Defense supplement thereto, provides any directly pertinent provision, as the conflict of interest rules therein are primarily aimed at financial or employment conflicts.

Finally, we note that this case does not require us to decide whether, or in what circumstances, a practitioner who receives a privileged communication under M.R.E. 513 may be ineligible to serve as a member of a board appointed under R.C.M. 706.

25

C.   TEST FOR EVALUATION OF POTENTIAL CONFLICTS

Because we are neither a legislative nor executive body, and because even an expansive interpretation of R.C.M. 706 does not suggest such an intent by the drafters, we decline to read that rule so as to contain a per se exclusion from participation in examining boards of practitioners who have either treated or diagnosed the subject of such a board.

After reviewing historical practice, our own precedent, and the legal reasoning of the court below, we agree that "an actual conflict of interest exists if a psychotherapist's prior participation materially limits his or her ability to objectively participate in and evaluate the subject of an R.C.M. 706 sanity board."  Best II, 59 M.J. at 892.

D.   APPLYING THE NEW TEST

   1.  Dr. Galloway's prior involvement

As Chief, Mental Health Division, USDB, Dr. Galloway was directed in January 2000 to assess Appellant to determine whether he was suffering from a psychosis and to determine the cause of his disruptive behavior.  When Dr. Galloway attempted to interview Appellant, he resisted and then declined, saying that God was taking care of him and he needed no mental treatment.  Best II, 59 M.J. at 889.  Dr. Galloway then reported to the commandant that she was unable to "determine the driving force behind Appellant's behavior," and posited a combination of

26

personality disorders and malingering as the most likely causes. She further recommended that Appellant's disruptions be treated as misconduct rather than medical issues. Id. About nine weeks later, when Appellant's behavior worsened and he began a hunger strike, Dr. Galloway asked Dr. Kirubakaran to effect an emergency consultation. Id. at 890. During the two days after Appellant's admission to the Department of Veterans Affairs (VA) hospital, Dr. Galloway made "more than ten phone calls to the VA doctors and nurses, and Dr. Kirubakaran, discussing appellant's mental and physical condition." Id. Amid questions of potential malingering, Appellant was released from the VA on April 6, 2000, by order of the VA's chief of psychiatric services. On April 17, Dr. Galloway again asked Dr. Kirubakaran to assess Appellant's symptomatic behavior in his cell. Id. At a hearing pursuant to Vitek v. Jones, 445 U.S. 480 (1980), on September 17, Dr. Galloway testified that, because she had not seen Appellant since April 2000, she had no current opinion of his condition. Best II, 59 M.J. at 891. Dr. Galloway did not treat or diagnose Appellant during their initial visit; she did only a brief assessment. Appellant was not one of her patients. Dr. Galloway is usually involved in sanity boards on prisoners because she works "behind the walls" and can gather necessary documents and information. Dr. Galloway does not believe she had any conflicts in her dealings with Appellant because she was

wearing the same hat -- performing assessments on someone who was not her patient. She also was not "protecting" her earlier diagnosis.

Q. You talked about the questions that the board had prior to it's [sic] meeting. Did you know the answers to those questions before the board met on the 21st of March?

A. I knew that Springfield had diagnosed him as schizophrenia. It's my job to make my own diagnosis, but in terms of the earlier questions like can he assist counsel right now, or whatever that – let me look at what the questions were.

Q. No, no, just testify from your recollection.

A. Okay. Okay, from my recollection, sir, I had Springfield's diagnosis, but my responsibility to make my own, and frankly theirs and mine didn't match, so it was my job to figure out what was going on, and who in my opinion was right. In terms of whether or not he was competent to assist counsel, I had no clue, because I hadn't seen him, and in terms of his --

Q. So the short answer is you didn't know before the board met?

A. No.

Q. You didn't know the answers to the questions?

A. Well, except that I did know their opinion on the diagnostic piece. I didn't know the rest at all.

Q. And you knew theirs disagreed with yours?

A. Right.

Q. Okay, now after the board met though, and after you -- I take it you were able to answer the four questions, as a member of the board, and your answer as to the diagnosis agreed with that of Springfield, did it not, after the board?

A.  Um-hum.  In essence, sir, they were right and I was wrong.

Q.  I see.

A.  Or at least my earlier one was wrong.

Q.  And you said it was your responsibility to reach a diagnosis.  How exactly do you do that at this board?  How did you reach the diagnosis that agreed with Springfield's?

A.  The same way you reach a diagnosis of anybody.  You ask them a whole lot of questions, because I know what symptoms are associated with what illnesses.

2.  Dr. Kirubakaran's prior involvement

When called by Dr. Galloway, Dr. Kirubakaran (the psychiatry medical officer at the Fort Leavenworth hospital) "immediately met with appellant in his cell."  Because Appellant was uncommunicative and appeared abnormal, Dr. Kirubakaran referred Appellant to the nearest emergency room for a complete examination.  He "diagnosed appellant "with a 'psychotic disorder [not otherwise specified] and concerns about catatonia'" and had Appellant admitted to the psychiatry ward of the Leavenworth VA hospital on April 3.  Best II, 59 M.J. at 890.  On April 17, when requested by Dr. Galloway, Dr. Kirubakaran met with Appellant in his cell for about fifteen to twenty minutes, observed that Appellant was "psychotic and agitated," but didn't make a treatment plan because Appellant was being transferred to federal prison because of Appellant's hunger strike.  Id.  After more than thirteen months at the

federal medical center, Appellant returned to the USDB, where Dr. Kirubakaran "began seeing him on a monthly basis."  Id. Prior to the sanity board, Dr. Kirubakaran saw Appellant twice, both for brief assessments, not amounting to evaluations and not amounting to treatment.  Because Dr. Kirubakaran's contacts with Appellant, prior to the sanity board, had been brief assessments, Dr. Kirubakaran did not believe that, clinically, he had a conflict of interest; however, once he became Appellant's treating psychiatrist, that analysis would be different.

## CONCLUSION

Adopting and applying the test formulated by the court below, we conclude that even if there exists some evidence of conflict, that evidence is insufficient to comprise an "actual conflict of interest."  There was no material limitation of either Dr. Galloway's or Dr. Kirubakaran's ability to participate objectively in the board or evaluate Appellant. Although there are conflict of interest rules for psychologists and commentary to the ethical guidelines for the practice of forensic psychiatry suggesting that psychiatrists "should generally avoid agreeing to be an expert witness or to perform evaluations of their patients for legal purposes," American Academy of Psychiatry and the Law Ethical Guidelines for the Practice of Forensic Psychiatry (adopted 1987, revised 1995),

those conflict rules do not apply to these facts. As Dr. Galloway put it, at least through the time of Appellant's sanity board, both Dr. Galloway and Dr. Kirubakaran were each wearing only "one hat." Neither was Appellant's psychotherapist. Neither did more than a brief assessment, followed in some cases by referral to those who could diagnose Appellant and offer him treatment. Consequently, there is no reason to question whether the board's membership complied with R.C.M. 706 or question the reliability of the trial results.

The decision of the United States Army Court of Criminal Appeals is affirmed.

United States v. Best, No. 00-0679/AR

BAKER, Judge (concurring in the result):

Dr. Galloway and Dr. Kirubakaran assessed Appellant's mental condition while Appellant was an inmate at the Disciplinary Barracks, Fort Leavenworth, Kansas. As recounted in the majority opinion, neither doctor assessed Appellant as suffering from a severe mental disease or defect. As a result, neither doctor treated Appellant for such a disease or defect. Dr. Galloway indicated in her assessment a suspicion that Appellant was malingering and that abnormalities in his behavior should be treated in the framework of custodial discipline and not as medical problems. However, there came a time when Appellant's behavior required medical treatment, and he was subsequently diagnosed with acute schizophrenia. Appellant was eventually referred to a board convened pursuant to Rule for Courts-Martial (R.C.M.) 706 by order of this Court. United States v. Best, 54 M.J. 367 (C.A.A.F. 2000). The board concluded that Appellant was not suffering from a severe mental disease or defect at the time of his original offense. Dr. Galloway and Dr. Kirubakaran served as two of the three members of Appellant's R.C.M. 706 board.

The question on appeal is whether Dr. Galloway or Dr.Kirubakaran had a conflict of interest that should have disqualified them from serving on Appellant's R.C.M. 706 board. Put into factual context, in light of their prior assessments,

which did not identify the severity of Appellant's condition, were they capable of impartially serving on Appellant's board without in some manner trying to validate or justify their prior judgments regarding Appellant?

Like this Court, the Court of Criminal Appeals found this to be a question of first impression. The lower court analogized to both the American Psychological Association's Code of Conduct (applicable to psychologists) and the American Medical Association's Principles of Medical Ethics (applicable to psychiatrists), as well as the conflict of interest standard for legal counsel articulated by the Supreme Court in Mickens v. Taylor, 535 U.S. 162, 172 n.5 (2002), to develop its standard for psychotherapist conflict of interest review. The Court of Criminal Appeals "conclude[d] that an actual conflict of interest exists if a psychotherapist's prior participation materially limits his or her ability to objectively participate in and evaluate the subject of an R.C.M. 706 sanity board." United States v. Best, 59 M.J. 886, 892 (A. Ct. Crim. App. 2004). However, the lower court, this Court, and the parties have struggled to place this issue in broader legal context. The majority, for example, concludes that the process associated with R.C.M. 706 boards is entirely a function of administrative law and executive discretion, and fails to place the issue presented into constitutional context.

United States v. Best, No. 00-0679/AR

While I agree with the majority's conclusion that Dr. Galloway and Dr. Kirubakaran did not bear a disqualifying conflict in this case, I believe the question presented finds its root in constitutional due process.  The Fifth and Fourteenth Amendments of the U.S. Constitution restrain government from depriving any person of life, liberty, or property without due process of law, and "protect[] the individual against the arbitrary action of government." Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 459-60 (1989); Ex parte Wilson, 114 U.S. 417, 426 (1885) ("The purpose of the [Fifth] Amendment was to limit the powers of the legislature, as well as of the prosecuting officers, of the United States.").  A protected liberty interest may arise from either the text of the Due Process Clause itself, or as a result of a statute or regulation that places substantive limitations on official discretion.  See Thompson, 490 U.S. at 462; Vitek v. Jones, 445 U.S. 480, 488 (1980); see also Ford v. Wainwright, 477 U.S. 399, 428 (1986) (O'Connor, J., concurring in part and dissenting in part) ("Our cases leave no doubt that where a statute indicates with 'language of an unmistakable mandatory character,' that state conduct injurious to an individual will not occur 'absent specified substantive predicates,' the statute creates an expectation protected by the Due Process Clause.") (quoting Hewitt v. Helms, 459 U.S. 460, 471-72 (1983)).

3

Under R.C.M. 706, once a mental examination is ordered, the matter shall be submitted to a sanity board charged to report on the mental responsibility or capacity of the accused.  The rule includes specific, discretion-narrowing directives for both the order authorizing the board and for the conduct of the board itself.  R.C.M. 706(c).  While Appellant may have had no independent constitutional right to an R.C.M. 706 board, once such a board was ordered, its evaluation must have been conducted in a manner consistent with the requirements of procedural due process.  See Wainwright, 477 U.S. at 428-29; see also Diaz v. Judge Advocate General of the Navy, 59 M.J. 34, 38 (C.A.A.F. 2003) (where statute has created appellate process as integral part of criminal justice system, procedures used in deciding appeal must comport with demands of due process and equal protection).

Such due process includes the right to a fair and impartial adjudicator.  Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 508 U.S. 602, 617 (1993) ("That officers acting in a judicial or quasi-judicial capacity are disqualified by their interest in the controversy to be decided is, of course, the general rule.") (quoting Tumey v. Ohio, 273 U.S. 510, 522 (1927)).  Cf. United States v. Dowty, 60 M.J. 163, 169 (C.A.A.F. 2004) ("This right [to an impartial jury] 'is the cornerstone of the military justice system.'") (quoting United States v. Hilow,

4

32 M.J. 439, 442 (C.M.A. 1991)); Article 37, Uniform Code of Military Justice, 10 U.S.C. § 837 (statute prohibiting any attempt to improperly influence the determinations of a court-martial or reviewing authority).  In the context presented at bar, the Court of Criminal Appeals adopted by analogy the conflict standards for psychotherapeutic professionals and for legal counsel to determine if the members of Appellant's R.C.M. 706 board were indeed impartial.  While I defer on whether this is the correct standard to apply in all R.C.M. 706 conflict of interest contexts (i.e., for both psychologists and psychiatrists), I am satisfied that this standard appropriately tested whether Dr. Galloway and Dr. Kirubakaran were "impartial."

I believe the facts as applied against this standard indicate that both were capable of impartial judgment.  Among other things, Dr. Galloway acknowledged under direct examination and cross-examination that she was incorrect in her initial assessment of Appellant.  Further, she demonstrated a willingness to reassess her judgment and to do so without apparent defensiveness or protection of her prior judgment.  As judges are asked on occasion to reconsider their judgments on appeal, based on perceived errors in law or fact, See, e.g., C.A.A.F. R. 31, I do not believe doctors as professionals are inherently incapable of doing the same absent a showing of

5

actual conflict.  In the context of the liberty interest associated with this particular R.C.M. 706 board, there was added protection in that the integrity and impartiality of the doctors' evaluation was subject to the crucible of cross-examination.

This would appear to leave Appellant in the position of arguing for a per se disqualification where an assessing psychotherapist subsequently serves on a R.C.M. 706 board. However, such a position is not required as a matter of statutory law or constitutional due process, where as here, Appellant has had the opportunity to test for impartiality. Moreover, in the military context, there may be good operational reasons why an assessing or treating physician may also be required to serve on an R.C.M. 706 board.

That being said, while the Government may be satisfied that a doctor can appropriately function as both a treating physician and subsequent board member in specific situations, that does not mean that a treating physician should always do so.  The Government might choose as a prudential matter to eliminate any possible appearance of a conflict of interest, and related litigation, by affirmatively selecting qualified R.C.M. 706 board members with no prior connection to the subject of the review.  Such an approach is consistent with the admonition in both the psychologists' Code of Conduct and the psychiatrists'

6

Principles of Medial Ethics, which disfavor, and in some cases

bar, a treating psychotherapist's performance of multiple roles.