986 So.2d 433 (2007)
T.O.B.
v.
C.J.B.
2060540.
Court of Civil Appeals of Alabama.
December 7, 2007.
*435 Alison Baxter Herlihy and Virginia Wiggs Haas, Mobile, for appellant.
John Wayne Boone, Mobile, for appellee.
THOMAS, Judge.
T.O.B. ("the father") and C.J.B. ("the mother") were divorced in October 2003. The divorce judgment incorporated an agreement of the parties providing, among other things, that they would have joint legal custody of their two daughters, four-year-old A.B. and three-year-old C.B. ("the children"), that the mother would have sole physical custody of the children, and that the father would pay child support and have liberal visitation privileges with the children.
During their marriage, the parties lived in Creola in Mobile County. After the divorce, the father moved to Tuscumbia in Colbert County, where he lived with his parents for a while until he purchased a home of his own. Because of the long driving distance between their residences, the parties agreed that each would have the children for alternating two-week periods of visitation, with the parties meeting in Clanton, halfway between their respective residences, to exchange the children. In April 2005, the father became concerned that the children might have been sexually abused while they were in the mother's custody. The father contacted an attorney, took the children to see a physician and a counselor, and refused to return the children to the mother. The father also filed in the Colbert Circuit Court a protection-from-abuse complaint and a complaint to modify the divorce judgment, seeking sole physical custody of the children. Both complaints were subsequently dismissed.
On September 30, 2005, the mother filed in the Mobile Circuit Court ("the trial court") a motion for immediate return of the children. She also petitioned to modify the divorce judgment, seeking an increase in child support and a modification of the father's visitation rights. On October 7, 2005, the father answered and filed a counterclaim seeking sole physical custody of the children. He also filed a motion for pendente lite custody of the children, which the trial court granted. On March 24, 2006, the trial court appointed a guardian ad litem for the children. On May 24, 2006, the mother filed a motion for pendente lite visitation with the children. Following a hearing on that motion, the trial court granted the mother visitation with the children during the weekend of July 28-30, 2006, with any further pendente lite visitation subject to a report by the guardian ad litem. The court ordered the mother not to allow any male friends, acquaintances, or family members to be around the children during her visitation periods.
Evidence presented during a three-day trial in September 2006 tended to show that the parties' alternating two-week visitation-period arrangement, which would have come to an end when A.B., the older child, began school in the fall of 2005, had been working well and that there had been no problems until April 17, 2005. On that date, the father testified, the children cried during the entire two and one-half hour drive from Clanton to Tuscumbia. The father had to work that evening; therefore, when he arrived at his parents' house, he left the children with their paternal grandparents. The paternal grandmother called the father at work that night at 10:00 p.m. to report a conversation that she had had with the children that evening. *436 When the father returned from work at 7:30 a.m. on April 18, he talked with the children, after which he contacted an attorney who recommended that the father speak to counselor Lynn McLean.
McLean, a social worker and a licensed professional counselor, testified that, on April 19, 2005, she met with the father and the paternal grandparents, who told her that the children, who were then five and four years old, respectively, reported that they had been molested by three men: S.H., the children's maternal step-grandfather; R.A., the children's maternal uncle; and D.P., the mother's boyfriend. The children made virtually identical reports with respect to S.H. and R.A.that each man had bathed them and had asked them to sit on his lap naked afterwards. With respect to D.P., they reported only that he had bathed them.
A.B. said that R.A. had "hurt her in the water" while bathing her. Both children said that S.H. had touched them in their private areas. In addition, the children stated that S.H. had asked them to "kiss [him] like they were married" and to "dance sexy" for him. The children told McLean that they had informed their mother of what the three men had done to them and that the mother had said, "That's nothing; don't worry about it and don't tell Daddy."
McLean conducted 26 counseling and play-therapy sessions with the children. She testified that during play therapy the children used dolls to demonstrate what had happened to them. McLean said that the children designated a male doll as "R.A.S.H." and that they exhibited both fear and anger toward that doll, hitting and biting it with a toy alligator and a toy shark and "slinging it to make sure it was gone." McLean found it significant that the children chose a large rubber snake toy and rubbed the snake on the private parts of a female doll. She stated that the snake represented inappropriate sexual touching, and she explained that the size of the snake indicated the degree of trauma that the children had experienced as a result of that touching. McLean gave her opinion that both children had been touched and hurt in their private parts and were suffering from post-traumatic stress disorder.
The father and the paternal grandfather testified to several incidents of what they considered to be oversexualized behavior on the part of the children before April 2005. The father said that during the spring and summer of 2004 A.B. had frequently danced naked in front of a mirror or struck a provocative pose, saying, "Ain't I sexy; take a picture of me." Both children told the father that S.H. had taken pictures of them. The father stated that, more than once, he found the girls under the bed covers "wrestling naked." The paternal grandfather referred to the children's "wrestling" as simulated "humping." The father testified that he had informed the mother of the children's oversexualized behavior, but, he said, the mother had dismissed his concerns, stating that the children "never acted that way" around her. The mother denied that the father had ever told her of his concerns on the topic.
The father testified that during the parties' marriage the mother had told him that she had been molested as a child by her mother's boyfriends. According to the father, the mother said that S.H. had gotten into bed with her and had touched her inappropriately and that R.A. had watched her bathing when she was a teenager. The father testified that the mother had told him that she had reported the events to her mother, the children's maternal grandmother, but that the maternal grandmother had not believed her. The father *437 said that the parties had agreed during the marriage not to leave the children for overnight visits at the maternal grandmother's house when S.H. and R.A. were there. The mother denied both that she had reported such events to the father and that such events had ever occurred.
In answer to a hypothetical question regarding the father's claim that the mother had been molested as a child and that the mother had not been believed when she reported the molestation to the maternal grandmother, McLean answered that it was possible that the mother was repeating with her children the "legacy of secrecy and denial" that the mother had experienced with the maternal grandmother. McLean explained that "the common dynamic" of sexual abuse would call for the mother to ignore or minimize the reports of abuse from her daughters because the mother's own reports as a child had been ignored or minimized.
M.B., the mother's 11-year-old daughter from a previous relationship and the half sister of A.B. and C.B., testified that every time the family went to the maternal grandmother's house she was with A.B. and C.B. and slept in the same room with them. M.B. said that neither S.H. nor R.A. had ever bathed the children. In addition, she said that A.B. and C.B. had never told her that anyone had hurt them. R.M., the mother's 25-year-old sister who spent a good deal of time either at the mother's house or at the maternal grandmother's house, also said that A.B. and C.B. had never told her that anyone had hurt or bothered them. She corroborated M.B.'s testimony that neither S.H. nor R.A. had ever bathed the children.
K.H., the maternal grandmother, testified that she had had a number of live-in boyfriends during the mother's formative years. She stated that one or more of her male companions might have disciplined the mother too harshly, but, she said, the mother had never reported any incident of child sexual abuse to her.
Several days after the trial, the guardian ad litem submitted a written report to the trial court. The report states that the guardian ad litem had consulted with both parties and their counsel, had interviewed several witnesses, had read all the documentary evidence submitted at trial, and had met with both children, although, the report notes, only A.B. had "shared any information." The report contains the following findings and opinions on the issue of custody:
"Both children were brought to my office by the father, [T.B.].... The younger of the two (2), [C.B.] was too shy and did not wish to speak with me away from her father. [A.B.], on the other hand, had no problem speaking to me away from her father and had no problem relating to me and telling her thoughts and observations.
"... [A.B.] came across as being intelligent for her age, and seemed to behave as one would expect a six (6) year old to act around adults. I found her statements to be quite bizarre at times but, upon further inquiry, she explained her statements as to what occurred and where her information came from. I have no reason not to believe what she told me in confidence and statements by other persons confirmed my suspicions from what she told me.
"Neither child was called to testify in this matter, so I will not state in this report what I was told by [A.B.]. I also have concerns about divulging any specific information given which might violate the attorney-client relationship I have with the children. Since I do believe what I was told and the father, [T.B.], testified in Court that I should believe what they told me, I have kept *438 [A.B.'s] statements in my head and used them to create the perspective for which I evaluate the evidence presented in this trial.
"I believe that counsel for both parties will admit that I have continued to err on the side of caution in this matter because of the serious allegations presented. I did not want to move forward on visitation until I had spoken with the parties and, most importantly, the children. I have not, nor do I now take the allegations levied in this matter lightly. Throughout this matter, I expressed my concerns to counsel for both parties and told them what I was looking for. I wanted to see a history prior to April 2005 and proof beyond the statements of [A.B.].
"Prior to April 2005, I knew of no indications, actions, statements or credible evidence of any molestation, improper touching or trauma occurring with [A.B.] or [C.B.]. The pleadings and evidence pointed to a happy existence until a night with the Paternal Grandmother, [S.B.], on April 17, 2005. After that night with [S.B.] there suddenly arose allegations of multiple molestations by at least three (3) different individuals. Each of the three (3) alleged molesters doing almost the exact same act, and creating an appearance of more than one (1) occurrence of the acts. After April 2005, [A.B.] seemed to be telling everyone she came in contact with in North Alabama about these alleged molestations. I therefore laid the gauntlet down that I wanted some witness or proof that either child ever said anything prior to speaking with the Paternal Grandmother on April 17, 2005.
"What was presented to this Court was the story of two (2) normal girls with parents who had come to their own agreement to allow equal time for each to see the children. This Court heard the testimony of two (2) other young girls, ages thirteen (13) and eleven (11) who were in the same places as [A.B.] and [C.B.], dealt with the same persons as [A.B.] and [C.B.] and yet have never seen the activities reported nor heard the allegations made by [A.B.] and [C.B.] until after April 17, 2005. The only issue and/or indication provided by any witnesses prior to that date is the Father's and Paternal Grandfather's concerns about the girls' `wrestling,' `the girls' wanting to be naked all the time' and `dirty dancing.' Even though the Father's immediate thoughts seemed to turn toward sexual activity by his children, his descriptions did not indicate any activity that I have not heard a thousand times by young children.
"The second thing that I was looking for in this matter was physical proof that any of this occurred. What was presented was an investigation by [the Department of Human Resources] that found no indication of abuse. There were physical exams done by the `National Children's Advocacy Center Sexual Abuse Clinic' that showed no physical proof. The narrative of those reports also state that [C.B.] `denied any private touches.' The alleged pictures of the girls posing in a provocative manner were never produced. The alleged pictures of the girls sitting on the laps of their male relatives were not produced. In fact, the closest thing presented as proof was the observations of the counselor, Lynn McLean.
"While I can appreciate Lynn McLean's expertise, I could not completely agree with all of her interpretations. My cross-examination showed that her observations could be interpreted in several different ways. I believe Ms. McLean believed the statement of [A.B.] and was simply interpreting the children's *439 actions in accordance with that belief. As was brought out in trial, however, my conversations with her discovered a lack of looking into where the girls' stories had come from. She did admit, however, that after our conversations she did observe the girls' fear of the Paternal Grandmother finding out they had fun at their Mother's home. This fear coincides with concerns expressed by [A.B.] in my office. I further believe Ms. McLean's admission of that fear can be related back to the report of Dr. Arata in which she reports [A.B.] as telling her `that Grandma says that her mommy is mean' but that `She said that her mother is not mean to her however.'
"From my observations, from my experience and from my beliefs in my clients' statements, I cannot find that the Father has met the high burden of [Ex parte] McLendon [,455 So.2d 863 (Ala.1984),] for a change of custody. I believe either he or his family knew the extended visitation was about to end and wanted to keep the children in their care. I believe a story was concocted and certain things were taken out of context and/or exaggerated to make a case. I see a pattern and repeat of the actions taken by the Father and his family against the Mother during the divorce proceedings. Those are the same actions which Dr. Arata found troubling and recommended the Mother have custody.
"I would hope that this honorable Court return the children to the Mother and accept everyone's recommendation that counseling be continued by [A.B.] and [C.B.]. There has been a great deal of confusion and distrust created. I would hope that the Court would put in writing her recommendation to the parties about communication and admonish the Father for the way he handled this matter. I would hope the Court would admonish the Mother for her activities with boyfriends while the children are present in the home. Finally, should this Court wish to prohibit any person from being around the minor children, I would recommend the Paternal Grandmother, [S.B.], not be allowed around either child."
The trial court entered a judgment on October 17, 2006, that, among other things, denied the father's petition to modify the child-custody provisions of the divorce judgment and maintained sole physical custody of the children with the mother. The judgment further provided, among other things:
"3. The [mother] shall make an appointment with Dr. Catalina Arata to share with her the results from the counselor who was hired by the [father's] family in north Alabama and show a report to Dr. Arata. Dr. Arata is requested to advise the [mother] of how to handle this situation with the children and the [mother] shall take the children to Dr. Arata for as many times as Dr. Arata believes necessary under the circumstances. The parties shall share the cost of Dr. Arata equally.
"4. The [mother] shall not allow the children [to be] unsupervised around the step-grandfather [S.H.] or the uncle [R.A.] pending further orders of the court.
"6. The [mother] shall not allow members of the opposite sex to whom she is not related by marriage or blood [to] stay in the house overnight when the children are present. The [mother] shall be vigilant in recognizing the need to protect her children from placing them in any situation with men in light of the allegations in this case.
"7. The Court is concerned that the [paternal] grandmother who helps the *440 [father] with babysitting a great deal is expressing a great deal of animosity about the [mother] to the children. The grandmother shall not in any way talk disparagingly about the [mother] in the presence of the children and shall not allow any conversation to be overheard by the children if it reflects negatively on the [mother] or the [mother's family]."
The father appealed.

Standard of Review
"When evidence in a child custody case has been presented ore tenus to the trial court, that court's findings of fact based on that evidence are presumed to be correct." Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996). "This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases." Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).
"The trial court is in the best position to make a custody determinationit hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing. See Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), wherein [the Alabama Supreme] Court, quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala. Civ.App.1993), set out the well-established rule:
"`"Our standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, Payne v. Payne, 550 So.2d 440 (Ala.Civ.App. 1989), and Vail v. Vail, 532 So.2d 639 (Ala.Civ.App.1988), and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow. Gamble v. Gamble, 562 So.2d 1343 (Ala.Civ.App.1990); Flowers v. Flowers, 479 So.2d 1257 (Ala.Civ.App. 1985)."'"
Ex parte Bryowsky, 676 So.2d at 1324. "[I]n the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous." Id.
"[T]he [Ex parte] McLendon [,455 So.2d 863 (Ala.1984),] test for a change of custody after custody is awarded in a divorce judgment is that the noncustodial parent seeking a change in custody must demonstrate (1) that he is fit to be the custodial parent; (2) that material changes that affect the child's welfare have occurred since the original award of custody; and (3) that the positive good brought about by the change in custody will more than offset the disruptive effect of uprooting the child."
Ex parte Martin, 961 So.2d 83, 87 (Ala. 2006).

I.
The father argues that the trial court's judgment denying his petition to modify custody and maintaining sole physical custody of the children with the mother was against the great weight of the evidence indicating that the children had been sexually abused while in the mother's care. In support of that argument, the father cites G.R.V. v. M.V., 825 So.2d 116 (Ala.Civ.App.2001), a case in which a father petitioned to modify the custody provisions *441 of a divorce judgment based upon allegations that the parties' four-year-old child had been physically and sexually abused by his teenaged half brother. This court reversed the trial court's denial of the petition to modify custody.
The father asserts that G.R.V. stands for the proposition that when a parent presents evidence indicating that a child has been sexually abused while in the other parent's custody and the custodial parent denies that any abuse has occurred, the evidence "requires a finding that the present custody arrangement is contrary to the child's safety and well-being." 825 So.2d at 120. Despite some obvious similarities between this case and G.R.V., G.R.V. cannot be read so broadly. In a disputed child-custody case, the fact that certain circumstances may be similar to the circumstances of a reported case is not determinative. The trial court's opportunity to observe the demeanor of witnesses is especially important in child-custody cases, see Ex parte Fann, supra, particularly when the allegations are as serious and as potentially inflammatory as those in the present case.
That said, there are important distinctions between this case and G.R.V. First, there was some physical evidence of the sexual abuse in G.R.V., including bruises and scratches in the child's genital area. In addition, the alleged perpetrator in G.R.V., the child's teenaged half brother, had a history of psychological problems, including both naivete and guilt about sexual matters, that caused the father's expert witness, a clinical psychologist, to believe the child's story and to disbelieve the teenaged half brother's denial. The most important distinction between this case and G.R.V., however, is that the evidence in G.R.V. was undisputed that the mother had reason to believe that inappropriate contact between the two boys had occurred  she had, in fact, punished the half brother and the child's half sister for touching the child's penis  yet she persisted in denying that the half brother had harmed the child. In G.R.V., the clinical psychologist testified that the mother "had problems dealing with stress, minimized the children's problems, and. . . . `was coaching the child to say or not to say certain things.'" 825 So.2d at 119.
In the present case, the father took the children to a local physician and to the National Children's Advocacy Center Sexual Abuse Clinic, but no physical evidence of sexual abuse was found. In addition, the Department of Human Resources investigated McLean's sexual-abuse report concerning the children and found it to be "not indicated." For all that appears in the record, none of the alleged perpetrators  family members, S.H. and R.A., and the mother's boyfriend, D.P.  had ever been the subject of a similar report by other children  or by these children  until April 17, 2005, despite the fact that all three alleged perpetrators had had access to the children for years. Three individuals who had been around S.H. and R.A. when those men had access to A.B. and C.B. testified that nothing out of the ordinary had ever occurred and that the children had never complained that anyone had hurt them.
Finally, unlike the situation in G.R.V., the evidence in the present case indicated that the paternal grandmother may have "coached" the children or made "suggestions" to them that resulted in the sexual-abuse allegations. The guardian ad litem was apparently of the opinion that the allegations in the present case could be attributed to the paternal grandmother's dislike of the mother and her disappointment at the prospect of losing extended visitation with the children once school started in the fall of 2005.
*442 Notably, although the trial court's judgment made no specific finding with respect to whether the alleged sexual abuse had actually occurred, it cautioned both the mother (to be vigilant in protecting her children) and the paternal grandmother (to refrain from disparaging the mother to the children) and ordered the mother to continue counseling services for the children. In light of the gravity of the allegations that were made and the fact that, had it believed the allegations, the trial court would most certainly have modified the custody provisions of the divorce judgment, we cannot escape the conclusion that the trial court disbelieved those allegations. The function of this court "is not to reweigh the evidence or to substitute our judgment for that of the trial court." Lewis v. Lewis, 494 So.2d 105, 106 (Ala. Civ.App.1986). As our supreme court stated in Ex parte Fann, 810 So.2d at 638:
"[The] contested evidence, taken in context, exemplifies the reason for the ore tenus presumption, `that is, that the trial court is in the ... position of discerning the demeanor and other like intangibles which do not transfer so readily in a transcript.' Shepherd v. Shepherd, 531 So.2d 668, 671 (Ala.Civ.App.1988). Stated another way, `the deference given to the trial court by the ore tenus rule is, in part, due to the trial court's unique position to see and/or hear something that may not be apparent on the face of the written record.' Willing v. Willing, 655 So.2d 1064, 1068 (Ala.Civ.App.1995) [(Thigpen, J., concurring in part and dissenting in part)]. See Dobbins v. Dobbins, 602 So.2d 900, 901 (Ala.Civ. App.1992) ('The reason for the ore tenus rule is [well established], i.e., that the trial court had the opportunity to observe the witnesses as they testified, to judge their credibility and demeanor, and to observe what this court cannot perceive from a written record.')."

II.
The father objected to those parts of the trial court's judgment that ordered the mother to make Dr. Catalina Arata aware of McLean's counseling notes and reports with respect to the children and to take the children for additional counseling with Dr. Arata. He maintains that, because Dr. Arata had previously performed a court-ordered evaluation of the parents for the purpose of making a custody recommendation at the time of the divorce in 2003, the trial court's judgment in 2006 ordering Dr. Arata to counsel the children with regard to the sexual-abuse allegations created an impermissible conflict of interest. He insists that Dr. Arata had previously "formulated an opinion" and "expressed a preference" for the mother over the father by recommending in 2003 that the mother be awarded physical custody of the children, thereby indicating, the father says, that Dr. Arata would "lack objectivity" in treating the children.
In support of his argument, the father cites two provisions of the American Psychological Association's Ethical Principles of Psychologists and Code of Conduct (2002):
"Standard 3.06 Conflict of Interest.
"Psychologists refrain from taking on a professional role when personal, scientific, professional, legal, financial, or other interests or relationships could reasonably be expected to impair their objectivity, competence, or effectiveness in performing their functions as psychologists."
"Standard 10.02(b) Therapy Involving Couples or Families.
"If it becomes apparent that psychologists may be called on to perform potentially *443 conflicting roles (such as family therapist and witness for one party on divorce proceedings), psychologists take reasonable steps to clarify and modify, or withdraw from, roles appropriately."
The record contains Dr. Arata's 2003 custody-evaluation report concerning both parents. That report states that "the decision regarding custody is difficult as both parents appear to be suitable caregivers... capable of providing a nurturing, caring environment for the children." Dr. Arata had recommended that the mother be awarded physical custody because, she believed, the mother would foster the children's relationship with the father, whereas, she thought, the father had not always been supportive of the children's relationship with the mother. In making her 2003 report, Dr. Arata was presented with no question regarding sexual abuse of the children and no issue with respect to the credibility of either parent. Therefore, as to the matters at issue in the instant proceeding, the trial court was authorized to conclude that Dr. Arata had not "formulated an opinion" and did not "lack objectivity."
In United States v. Best, 61 M.J. 376 (C.A.A.F.2005), Jermain Best had been convicted by general court martial of murder, assault, and carrying a concealed weapon. On appeal, Best had raised issues regarding his mental competence to stand trial and his sanity at the time of the alleged offenses. In November 2000, the United States Court of Appeals for the Armed Forces remanded the cause for the conduct of a mental examination, after which Best was examined by a sanity board. See United States v. Best, 54 M.J. 367 (C.A.A.F.2000). The board reported that Best had been both competent to stand trial and sane at the time of the charged offenses.
In a subsequent appeal, the Court of Appeals for the Armed Forces, in an opinion issued in December 2001, "question[ed] the reliability of the sanity board report on the basis of an alleged conflict of interest created by membership on the board of two psychotherapists who had previously assessed [Best's] mental condition" and, again, remanded the cause. 61 M.J. at 377; see United States v. Best, 56 M.J. 251 (C.A.A.F.2001). In a third appeal, the Court of Appeals for the Armed Forces adopted the following conflict-of-interest test used by the United States Army Court of Criminal Appeals:
"`[A]n actual conflict of interest exists if a psychotherapist's prior participation materially limits his or her ability to objectively participate in and evaluate the subject of [a] ... sanity board.'"
61 M.J. at 387 (quoting United States v. Best, 59 M.J. 886, 892 (A.Ct.Crim.App. 2004)). In deciding whether an "actual conflict" existed, the Court of Appeals for the Armed Forces examined, among other things, Standard 3.06 of the American Psychological Association's Ethical Principles of Psychologists and Code of Conduct and concluded that the two psychotherapists had no "actual conflict of interest" because neither had assessed Best as suffering from a mental disease or defect, had treated Best for such a disease or defect, or had been Best's psychotherapist. Instead, the Court concluded, the psychotherapists
"were each wearing only `one hat.' Neither was [Best's] psychotherapist. Neither did more than a brief assessment, followed in some cases by referral to those who could diagnose [Best] and offer him treatment. Consequently, there is no reason to question whether the board's membership complied with [the applicable military regulation relating to the composition of sanity boards] or *444 question the reliability of the trial results."
61 M.J. at 388 (emphasis added). Similarly, in the present case, when Dr. Arata assessed both parents in 2003 to provide a court-ordered custody-evaluation report, she was wearing only "one hat." Dr. Arata was not the mother's "psychologist," and the mother was not Dr. Arata's "patient." We, therefore, hold that the limited assessment performed by Dr. Arata in 2003 could not "reasonably be expected to impair [her] objectivity, competence, or effectiveness in performing [her] functions as [a] psychologist[ ]" in counseling the parties' children with respect to child-abuse allegations that surfaced after 2003.
The judgment of the Mobile Circuit Court is affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, J., concur.
BRYAN, J., concurs in the rationale in part and concurs in the result, with writing.
MOORE, J., concurs in the result, without writing.
BRYAN, Judge, concurring in the rationale in part and concurring in the result.
I concur in the section of the main opinion entitled "Standard of Review" and in Part I of the main opinion, which addresses the denial of the father's petition to modify custody. I concur in the result as to Part II, which affirms the trial court's judgment insofar as it orders Dr. Arata to counsel the children.