IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83491-6-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| STEVEN LEE BROWN, | |
| Appellant. | |

SMITH, A.C.J. — Steven Brown was convicted on several counts of child rape and child molestation in 2020, after undergoing multiple rounds of competency evaluation and competency restoration treatment. Brown moved for a new trial based on newly discovered evidence implicating a different suspect and on alleged juror misconduct. The court denied the motion. Brown appeals, challenging the court's appointed expert, its denial of a motion to continue and the motion for a new trial, and its imposition of community custody supervision fees.

We conclude that the court did not abuse its discretion by appointing a competency evaluator who could perform the evaluation in Brown's first language, even though the evaluator had also provided Brown competency restoration treatment. We also conclude that the court did not abuse its discretion by denying the motion to continue or a motion for a new trial based on unauthenticated and tenuous newly discovered evidence and reports of jury

Citations and pin cites are based on the Westlaw online version of the cited material.

conduct that inhered in the verdict. However, because the court appears to have erroneously imposed the supervision fees, we reverse in part and remand for the court to strike these fees from Brown's judgment and sentence.

FACTS

In 2016, Steven Brown was charged with several counts of child rape and child molestation against two victims, K.F. and C.F. Brown is deaf and was friends with the victims' parents, J.F. and R.F, who are also deaf. K.F. and C.F. reported that when they were in middle school, they each spent the night alone at Brown's residence and on those occasions, Brown molested them and raped C.F.

In January 2017, Brown's attorney requested and the court ordered a competency evaluation for Brown. In April, Dr. Jaime Wilson performed a psychological evaluation in American Sign Language (ASL) and found that Brown exhibited extreme impairment in his ability to consult with counsel and moderate impairment in his factual understanding of the courtroom. Dr. Wilson concluded that Brown was not competent to participate in court proceedings but recommended that he be referred for competency remediation services, ideally with a provider who could communicate directly in ASL.

Between June and August of 2017, Dr. Ray Hendrickson performed additional competency evaluations—using ASL interpreters—and also concluded that Brown was not competent, based on his limited factual understanding of court proceedings, his significantly impaired rational understanding of the proceedings, and his significantly impaired ability to consult with his attorney.

2

In November of 2017, the court ordered 90 days of competency restoration treatment. Brown was admitted to inpatient treatment at Western State Hospital in April of 2018. After 10 weeks of one-on-one instruction for 18 hours a week, with an ASL interpreter and a certified deaf interpreter, and visual aids and demonstrations of courtroom procedures, the evaluator concluded that Brown still lacked the capacity to understand the proceedings against him and to assist in his defense. The evaluator, Dr. Johnathan Sharrette, did not recommend any further treatment, concluding that there was "no evidence that Mr. Brown will benefit in any significant way from additional instruction."

In August 2018, Brown moved to dismiss the case based on his inability to be restored to competency, but after a contested hearing the court ordered Dr. Wilson to reevaluate Brown. After Dr. Wilson concluded that Brown was restorable, the court ordered Dr. Wilson to provide an additional 90 days of treatment. Brown moved for the court to appoint an expert other than Dr. Wilson to perform the next evaluation, claiming that Dr. Wilson had a conflict of interest based on his role as both an evaluator and restoration treatment provider. The court denied the motion. On March 8, 2019, based on Dr. Wilson's report among other evidence, the court found Brown competent to proceed in trial.

The case proceeded to trial in February 2020. On the second day of trial, after C.F. and K.F. had testified, Brown moved for a mistrial or, alternatively, a continuance based on new evidence. Brown's attorney reported that she had just been shown a Facebook message that Brown's roommate Manny Oriza had received in October 2019. The Facebook message was purportedly from Jorge

German, a friend of the victims' family who had lived with them for several years, claiming that he had molested C.F. and K.F., not Brown.  Citing doubts about the message's authenticity and admissibility, the court denied the motion.

On March 2, 2020, the jury found Brown guilty of second-degree child rape, second-degree child molestation, and two counts of third-degree child molestation.

On May 6, 2020, Brown moved for a new trial or relief from judgment.  He cited the Facebook message purporting to be from German as newly discovered evidence.  He also claimed that Juror 8 had committed misconduct based on a different juror's statement that Juror 8 told a detailed story about a close family member being sexually assaulted at the start of deliberations, stated that she believed Brown was guilty before deliberations began, and stated that she believed the victims and their parents implicitly.  The court denied the motion, finding that Brown did not establish juror misconduct and that the new evidence was not material, would not change the result of trial, and could potentially have been discovered before trial with due diligence.

The court sentenced Brown to 245 months to life confinement.  It found Brown indigent and stated that it would impose "only those fees and obligations as required by law," but the judgment and sentence imposed community custody supervision fees.

Brown appeals.

ANALYSIS

Appointment of Qualified Expert

Brown contends that the court failed to comply with RCW 10.77.060 because its designated expert, Dr. Wilson, was not "qualified" given that he both treated and evaluated Brown. We disagree.

"In Washington, a person is competent to stand trial if [they have] the capacity to understand the nature of the proceedings against [them] and if [they] can assist in [their] own defense." State v. Ortiz, 104 Wn.2d 479, 482, 706 P.2d 1069 (1985). So long as there is a question about the defendant's competency, the procedures in chapter 10.77 RCW are "mandatory to satisfy due process." State v. Heddrick, 166 Wn.2d 898, 909, 215 P.3d 201 (2009). RCW 10.77.060(1)(a) requires that when reason exists to doubt a defendant's competency, the court "shall . . . appoint . . . a qualified expert or professional person . . . to evaluate and report upon the mental condition of the defendant." Not only must the expert be qualified, but the court must "ensure that a statutory competency evaluation is conducted in a qualified manner." State v. Sisouvanh, 175 Wn.2d 607, 621, 290 P.3d 942 (2012).

"[A] trial court's determination of the underlying adequacy of a statutory competency evaluation [is] reviewed for abuse of discretion." Id. at 620. Thus, "so long as the underlying adequacy of a given competency evaluation is 'fairly debatable,' the trial court has discretion to accept or reject that evaluation in satisfaction of RCW 10.77.060." Id. at 623 (internal quotation marks omitted) (quoting Walker v. Bangs, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979)).

Here, Brown contends that Dr. Wilson was not "qualified" (or did not conduct the evaluation in a qualified manner) because he violated his ethical obligations by both providing treatment for Brown and then evaluating Brown's competence. Brown points to the American Psychological Association's (APA) "Ethical Principles of Psychologists and Code of Conduct," and contends that Dr. Wilson violated its provisions with respect to multiple relationships and conflicts of interest. The relevant provisions read, in full:

3.05 Multiple Relationships

(a) A multiple relationship occurs when a psychologist is in a professional role with a person and (1) at the same time is in another role with the same person, (2) at the same time is in a relationship with a person closely associated with or related to the person with whom the psychologist has the professional relationship, or (3) promises to enter into another relationship in the future with the person or a person closely associated with or related to the person.

A psychologist refrains from entering into a multiple relationship if the multiple relationship *could reasonably be expected to impair the psychologist's objectivity, competence, or effectiveness* in performing his or her functions as a psychologist, or otherwise risks exploitation or harm to the person with whom the professional relationship exists.

*Multiple relationships that would not reasonably be expected to cause impairment or risk exploitation or harm are not unethical.*

(b) If a psychologist finds that, due to unforeseen factors, a potentially harmful multiple relationship has arisen, the psychologist takes reasonable steps to resolve it with due regard for the best interests of the affected person and maximal compliance with the Ethics Code.

(c) *When psychologists are required by law, institutional policy, or extraordinary circumstances* to serve in more than one role in judicial or administrative proceedings, at the outset *they clarify role expectations and the extent of confidentiality and thereafter as changes occur*. . . .

6

3.06 Conflict of Interest

Psychologists refrain from taking on a professional role when personal, scientific, professional, legal, financial, or other interests or relationships *could reasonably be expected to (1) impair their objectivity, competence, or effectiveness* in performing their functions as psychologists or (2) expose the person or organization with whom the professional relationship exists to harm or exploitation.

(Emphasis added.)

Accepting Brown's proposition that an expert must comply with these standards to be "qualified" under RCW 10.77.060,[1] the record does not establish that Dr. Wilson violated these provisions. The multiple relationships standard and conflict of interest standard only direct psychologists to refrain from taking a role when it could "reasonably be expected" to impair their "objectivity, competence, or effectiveness." Whether providing both competency restoration treatment and competency evaluations to Brown would impair Dr. Wilson's objectivity, competence, or effectiveness is a matter that is fairly debatable and therefore in the trial court's discretion. Moreover, the multiple relationships standard specifically contemplates that psychologists may be "required by law, institutional policy, or extraordinary circumstances to serve in more than one role."[2] That is the case here—the court noted that Dr. Wilson "seem[ed] to be

---

[1] While it certainly seems appropriate for a trial court to only appoint experts who comply with ethical standards, the statute itself gives no definition of "qualified," let alone an explicit reference to the APA standards specifically. RCW 10.77.060.

[2] Evidence submitted to the trial court indicated at least one doctor's conclusion that "there are no ethical issues with an evaluator also providing restoration services, especially in cases where there is such a distinct need for specialized services."

7

uniquely qualified" as a psychologist who was also fluent in ASL.[3] In the absence of an indicator that Dr. Wilson violated his ethical obligations, we conclude that the court did not abuse its discretion by appointing him.

Brown disagrees and points to United States v. Best, a case from the United States Court of Appeals for the Armed Forces. 61 M.J. 376 (2005). In that case, the court addressed whether there was a conflict of interest where members of the board that assessed the defendant's sanity had previously assessed the defendant individually. Id. at 377. The court reviewed the lower court's "assessment of the reliability of trial proceedings" de novo. Id. at 381. It concluded that there was no "per se exclusion from participation in examining boards of practitioners who have either treated or diagnosed the subject of such a board," and that there was "no material limitation" of either doctor's "ability to participate objectively in the board," given that each doctor had only briefly assessed the defendant. Id. at 387-88. Here, although Dr. Wilson had more involvement with Brown before evaluating him than the doctors in Best, it is still not clear that there was a material limitation on Dr. Wilson's objectivity. And unlike Best, we must defer to the court's discretion. We therefore conclude that

---

[3] The record indicates that there may have been another psychologist available to conduct the evaluation in ASL—the State requested that if the court did bar Dr. Wilson from conducting the evaluation, "a sign language fluent associate in Dr. Wilson's office, Dr. Colleen Donohue, Psy.D, should be ordered to complete the evaluation in his place." It seems that such an option would have been preferable, and that it is generally a best practice to have restoration treatment and evaluation conducted by different doctors. But given the lack of information or argument concerning this potential alternative, we cannot say that the court abused its discretion by appointing Dr. Wilson.

the court complied with RCW 10.77.060 and did not abuse its discretion in appointing an expert and ultimately finding Brown competent.

## Motion to Continue

Brown contends that the court abused its discretion by denying his motion to continue trial after he discovered the Facebook message. We disagree.

We review a denial of a motion for continuance for an abuse of discretion. State v. Downing, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004). "In exercising discretion to grant or deny a continuance, trial courts may consider many factors, including surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure." Id. at 273.

The denial of a motion to continue may deny a defendant of due process. Id. at 274. "Whether the denial of a continuance rises to the level of a constitutional violation requires a case by case inquiry," and "the court must examine the totality of the circumstances." Id. at 275; State v. Jennings, 35 Wn. App. 216, 220, 666 P.2d 381 (1983). But "the decision to deny a continuance will be reversed only on a showing that the accused was prejudiced by the denial and/or that the result of the trial would likely have been different had the continuance not been denied." State v. Tatum, 74 Wn. App. 81, 86, 871 P.2d 1123 (1994).

Here, the court did not abuse its discretion. Brown's motion for a continuance came on the second day of trial, after Brown, through his mother, let his attorney know that Oriza had received a Facebook message from Jorge German more than four months before the trial. Brown's attorney told the court

9

that the message appeared to be from German's Facebook page and stated that German, not Brown, had abused the victims. She noted that Brown had consistently claimed that German was the actual perpetrator, but that there had previously been insufficient evidence to support that theory.

Because there are several indicators supporting a conclusion that the message was inauthentic, Brown cannot show that the result of trial would likely have been different if the continuance had not been denied. The message was purportedly from German claiming not only that he had molested the victims, but that he knew Brown had not molested them. But testimony indicated that Brown was the only person in the room with the victims during the rape and molestation, so it is unclear how German would know that Brown was not a perpetrator. While the last message suggests a conspiracy between German and the victims' father ("Not steve brown Just [J.F.] and me"), the first message says the author is "lying to all [J.F. R.F. C.F. K.F. and] mona." The victims in this case were teenagers who had known both German and Brown for years, so both of them mistaking the perpetrator's identity is implausible. The message was apparently not discovered until the first day of trial, even though it was sent months prior. See State v. Riofta, 166 Wn.2d 358, 372, 209 P.3d 467 (2009) ("in evaluating probative force of newly presented evidence 'the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence' " (quoting Schlup v. Delo, 513 U.S. 298, 332, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995))). The message was sent from an account named "Jorge German," but the account did not have a profile picture,

and the defense never provided, for instance, a screenshot of the Facebook account that might indicate whether it was used for anything aside from sending the message.[4]

As the prosecutor pointed out, information in the record indicated that after Brown was arrested, Brown's mother texted the victims' family to say that Brown had not molested the children and German had. Later, someone called Child Protective Services (CPS) and told them that German had molested the children, and CPS came to the victims' house to ask them about it, but immediately closed the investigation upon finding out that Brown was being prosecuted. The prosecutor represented at the continuance hearing that Brown had subpoenaed the CPS records months before the trial to find out who made the CPS call and never reported anything about the results. These facts further undermine the authenticity of the Facebook message.

Moreover, the court noted that the Facebook message appeared to be inadmissible hearsay. While it may have provided defense counsel with more incentive to investigate her client's theory, she had been aware of this theory for at least three years. And in her motion for a new trial more than two months later, she had no further information to provide to support the message's authenticity. She noted only that

> Defense investigator, Jerry Crow, was able to conduct a brief interview with Mr. Rodriguez about receiving the message and attempted to contact Mr. German via Facebook. Defense Counsel

---

[4] While not conclusive, it is also worth noting that the writing in the Facebook message reads similarly to the writing in Facebook messages sent by Brown to one of the victims.

also attempted to learn Mr. German's contact information from the victim's parents, but they did not know his address although they had been there.

Given that no admissible evidence appeared to follow from the discovery of the Facebook message, it is unlikely that granting a continuance would have changed the outcome of trial. Moreover, the court was balancing the orderly procedure of a trial that had just begun after a years-long delay, in a case where the court is generally required to weigh any reasons for a continuance against the detriment to the victims of sex crimes. RCW 10.46.085.

The court did not abuse its discretion by denying the motion for a continuance.

## Motion for a New Trial

Brown contends that the court abused its discretion by denying his motion for a new trial based on newly discovered evidence and juror misconduct. We disagree.

The court may grant a new trial based on newly discovered evidence or juror misconduct "when it affirmatively appears that a substantial right of the defendant was materially affected." CrR 7.5(a). "The decision to grant or deny a new trial will not be disturbed unless it constitutes a manifest abuse of discretion." State v. Dawkins, 71 Wn. App. 902, 906, 863 P.2d 124 (1993).

### 1. Newly Discovered Evidence

First, the court did not abuse its discretion by denying the motion based on newly discovered evidence.

The trial court should grant a motion for a new trial based on newly discovered evidence if the moving party shows that "the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching." State v. Williams, 96 Wn.2d 215, 223, 634 P.2d 868 (1981) (emphasis omitted). "The absence of any one of the five factors is grounds for the denial of a new trial." Id.

Here, as discussed above, Brown fails to show that the new evidence would probably change the result of trial. The Facebook message itself was likely inadmissible as hearsay and because it lacked authentication, and Brown failed to obtain any new evidence about the purported confession in the two months after trial. Even if the message was admissible, there are significant questions about its authenticity that Brown failed to address (for instance, by submitting a screenshot of the Facebook profile or recounting any efforts to locate German beyond asking the victims' parents for his address). Moreover, the message itself was not strictly newly discovered evidence, but was instead discovered during trial.

The court did not abuse its discretion by denying a new trial on the grounds of newly discovered evidence.

2. Juror Misconduct

Brown also contends that juror misconduct required a new trial. We disagree.

13

"Appellate courts will generally not inquire into the internal process by which the jury reaches its verdict." Breckenridge v. Valley Gen. Hosp., 150 Wn.2d 197, 204, 75 P.3d 944 (2003). "The individual or collective thought processes leading to a verdict 'inhere in the verdict' and cannot be used to impeach a jury verdict." State v. Ng, 110 Wn.2d 32, 43, 750 P.2d 632 (1988) (quoting State v. Crowell, 92 Wn.2d 143, 146, 594 P.2d 905 (1979)). "Juror use of extraneous evidence is misconduct and entitles a defendant to a new trial, if the defendant has been prejudiced." State v. Boling, 131 Wn. App. 329, 332, 127 P.3d 740 (2006). "Jurors may, however, rely on their personal life experience to evaluate the evidence presented at trial during the deliberations." Breckenridge, 150 Wn.2d at 199 n.3, 202-04 (juror's comparison of his wife's medical care for migraines to facts in the case inhered in verdict); Richards v. Overlake Hosp. Med. Ctr., 59 Wn. App. 266, 273-74, 796 P.2d 737 (1990) (juror's evaluation of evidence based on her medical training was not extraneous evidence; juror had disclosed her medical background during voir dire). Furthermore, the "*mere* revealing of an opinion, as to the ultimate outcome of a trial by an otherwise unbiased juror, before submission of the case to the jury . . . does not, standing alone, constitute such misconduct as to justify the granting of a new trial." Tate v. Rommel, 3 Wn. App. 933, 937-38, 478 P.2d 242 (1970).

Here, Brown claims that Juror 8 introduced extraneous evidence into deliberation by telling a detailed story about a family member who was sexually assaulted as a child, and that she committed misconduct by expressing at the beginning of deliberations that Brown was guilty. First, Brown's assertion fails

because it relies on the defense investigator's notes of his discussions with other jurors, and these notes appear to be inadmissible hearsay. State v. Jackman, 113 Wn.2d 772, 777, 783 P.2d 580 (1989). Second, the juror's discussion of her family member's experience was not extraneous evidence, as it did not relate to the facts of the case but instead related to the juror's personal life experience. The discussion also inhered in the verdict because it related to her individual thought process. Ng, 110 Wn.2d at 43. And finally, the juror's statement at the beginning of deliberations, after the conclusion of the trial, that she believed Brown was guilty, along with any other statements during deliberations that Brown would have us interpret as indicating a predisposition against him, inhere in the verdict because they relate to her thought processes. The court did not abuse its discretion by denying a new trial on these grounds.

<u>Community Custody Supervision Fees</u>

Finally, Brown challenges the trial court's imposition in the judgment and sentence of community custody supervision fees, contrary to its oral ruling. The State concedes that these should be stricken, and we agree.

The court stated that it was "imposing only those fees and obligations as required by law," but the judgment and sentence contained form language requiring Brown to "pay supervision fees as determined by" the Department of Corrections. "[B]ecause 'supervision fees are waivable by the trial court, they are discretionary [legal financial obligations].' " State v. Bowman, 198 Wn.2d 609, 629, 498 P.3d 478 (2021) (quoting State v. Dillon, 12 Wn. App. 2d 133, 152, 456 P.3d 1199, review denied, 195 Wn.2d 1022, 464 P.3d 198 (2020)). The trial

court committed procedural error by imposing the supervision fee where it had stated it was waiving discretionary fees and the remedy is to remand to strike the fees from the judgment and sentence. Bowman, 198 Wn.2d at 629.

We reverse in part and remand for the court to strike the supervision fees.

Smith, A.C.J.

WE CONCUR:

Coburn, J.          Andrus, C.J.